# UNITED STATES DISTRICT COURT

### for the
### Southern District of Indiana

**SEALED**

| In the Matter of the Search of | | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. |

Information associated with justin.burnes@heartlandflag.com, joshua.burkhart@heartlandflag.com, administrator@heartlandflag.com, jburkhart73.g.mail.com, which are stored at premises controlled by Google Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, as more fully described in Attachment A-1, and

Information associated with jburk11@hotmail.com, which is stored at premises controlled by Microsoft Corporation, an email provider headquartered at One Microsoft Way, Redmond, WA 98052, as more fully described in Attachment A-2

Case No.
1:16-mj-0293
1:16-mj-0294
1:16-mj-0295
1:16-mj-0296
1:16-mj-0297

**FILED**

**MAY 0 2 2016**

U.S. MAGISTRATE JUDGE
INDIANAPOLIS, INDIANA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Information associated with justin.burnes@heartlandflag.com, joshua.burkhart@heartlandflag.com, administrator@heartlandflag.com, jburkhart73@gmail.com, which are stored at premises controlled by Google Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, as more fully described in Attachment A-1, and

Information associated with jburk11@hotmail.com, which is stored at premises controlled by Microsoft Corporation, an email provider headquartered at One Microsoft Way, Redmond, WA 98052, as more fully described in Attachment A-2

located in the _____ Southern _____ District of _____ Indiana _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Joseph Weston, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____05/02/2016_____

_____
*Judge's signature*

City and state: Indianapolis, Indiana

Mark J. Dinsmore U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## SEARCH AND SEIZURE WARRANTS

I, JOSEPH P. WESTON, being duly sworn, hereby depose and state:

## INTRODUCTION

1. **Introduction.** I make this affidavit in support of an application for search warrants for information associated with accounts **justin.barnes@heartlandflag.com**, **joshua.burkhart@heartlandflag.com**, **administrator@heartlandflag.com**, and **jburkhart73@gmail.com**, which are stored at premises controlled by Google Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043 ("Google"), and **jburk11@hotmail.com**, which is stored at premises controlled by Microsoft Corporation, an email provider headquartered at One Microsoft Way, Redmond, WA 98052 ("Hotmail"). (All four email accounts are further described herein and in Attachments A-1 and A-2 and are collectively referred to in this Affidavit as the "Accounts.") This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google and Hotmail to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate and seize the items described in Section II of Attachment B.

2. **Your Affiant.** I am employed as a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have served as a Special Agent ("SA") for one year and work from the FBI's Indianapolis Field Office. I am presently assigned to a complex financial crime squad, which has investigative responsibility for fraud and other white collar crime investigations. I received training in the investigation and enforcement of

federal laws at the FBI Academy in Quantico, Virginia. Prior to becoming a Special Agent, I worked as a Forensic Accountant in the FBI's Sacramento Division for three years, where I assisted with investigations involving complex financial matters. As an FBI Special Agent, I have participated in arrests, investigations, searches, and seizures and have investigated federal criminal violations of Title 18 crimes. The statements in this affidavit are based on information obtained from personal observation, witnesses, documents, or other law enforcement personnel.

3. **Relevant Criminal Laws.** Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that JOSH BURKHART, JIM BURKHART, and others committed criminal violations of the federal criminal code (Title 18), including sections 1343 (wire fraud), 1347 (health care fraud), 1349 (conspiracy to commit wire fraud or healthcare fraud), 1956(h) (money laundering conspiracy), 1957 (money laundering), and 371 (conspiracy), among others.

4. **Not All Knowledge of Investigation.** This affidavit is intended to show that there is sufficient probable cause for the requested search and seizure warrants and does not purport to set forth all the affiant's knowledge of the investigation into this matter.

5. **Sources of Information.** The information in this affidavit is a compilation of information developed during the ongoing criminal investigation that started in June of 2015 of the above-described violations. The investigation has been conducted by me and other federal agents and law enforcement personnel from the FBI, Internal Revenue Service Criminal Investigations (IRS-CI); and Department of Health and Human Services, Office of the Inspector General-Office of Inspections (HHS-OIG-OI). My knowledge is derived from my own personal observations and from a variety of credible sources, including interviews with witnesses and co-

conspirators and reviews of and conversations with other law enforcement officers about bank records, public records, and documents obtained from individuals and businesses.

## **JURISDICTION**

6.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See also* 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## FACTUAL BACKGROUND

### *Relevant Entities and Individuals*

8.    **American Senior Communities LLC ("ASC")** is a limited liability company organized under the laws of the State of Indiana. ASC manages over 70 senior care facilities in Indiana. ASC is based in Indianapolis, Indiana, and is owned by members of the Jackson family and David R. Justice. ASC is managed by a Board of Managers, represented by the following individuals: Ethan Jackson, Franklin L. Jackson, Blake A. Jackson, Wessley E. Jackson, Mark A. Jackson, and David R. Justice. Each member's business address is 6900 South Gray Road, Indianapolis, Indiana 46237.

9.    **James Burkhart ("JIM BURKHART")**, a resident of Carmel, Indiana, was the Chief Executive Officer of ASC. As CEO, JIM BURKHART was authorized, among other things, to cause ASC to enter into contracts with and make payments to third-party vendors. JIM BURKHART was not, however, an owner of ASC.

10.    **Joshua Burkhart ("JOSH BURKHART")**, a resident of Fishers, Indiana, was employed by Bradley Associates P.C., which is an accounting firm that provided services to ASC in connection with reports to federal healthcare programs, such as Indiana Medicaid. JOSH BURKHART is also the owner of Heartland Flag LLC and Circle Consulting LLC, both which did business with and received payments from ASC or entities related to ASC. JOSH BURKHART did not disclose to Bradley Associates P.C. that his companies did business with ASC. JOSH BURKHART is also JIM BURKHART's brother.

11.    **Circle Consulting LLC ("CIRCLE CONSULTING")** was a limited liability company organized under the laws of the State of Indiana. JOSH BURKHART was the registered agent and sole member of CIRCLE CONSULTING.

4

12.     **Heartland Flag LLC ("HEARTLAND FLAG")** was a limited liability company organized under the laws of the State of Indiana. JOSH BURKHART was the registered agent and sole member of HEARTLAND FLAG.

13.     **Mainscape LLC ("MAINSCAPE")** is a corporation organized under the laws of the State of Indiana. MAINSCAPE, based in Fishers, Indiana, is a landscape management company that provides outdoor maintenance services such as landscaping, irrigation, mowing, and snow removal to commercial customers. Since approximately 2005, MAINSCAPE has provided ASC with various outdoor maintenance services.

14.     **David Mazanowski ("MAZANOWSKI")**, a resident of Carmel, Indiana, is the 100 percent owner and CEO of MAINSCAPE. As CEO, MAZANOWSKI managed MAINSCAPE's business relationship with ASC.

### *ASC's Relationship with Indiana Medicaid and Health & Hospital*

15.     **Indiana Medicaid.** Medicaid is a medical assistance program for low-income individuals and others. The program is funded and run jointly by federal and state governments. The level of federal funding varies by state. In Indiana, the federal share of funding is approximately two-thirds, while the State of Indiana's share is approximately one-third. The federal government, through the Centers for Medicare and Medicaid Services, sets general guidelines under which states administer their Medicaid programs. Within those broad federal rules, each state decides who is eligible for Medicaid, which services are covered, how much should be reimbursed for those services, and operationally how claims should be received and paid. The state, not the federal government, is responsible for receiving, reviewing, and paying claims for reimbursement, whether from patients or providers. *See* 42 U.S.C. § 1396 et seq. The

State of Indiana administers its Medicaid program through the Family and Social Services Administration ("FSSA") and Office of Medicaid Policy and Planning ("OMPP"). Thus, it is FSSA and OMMP that determines, among other things, who is eligible for Medicaid, what products and services are covered, and what the reimbursement rates are for those products and services. *See, e.g.*, Ind. Code. §§ 12-8-1-1 et. seq.; 12-15-1-1 et seq.; Indiana Executive Order 11-80 (July 1, 2011).

16.    **Health and Hospital Corporation of Marion County ("HEALTH & HOSPITAL")** is a municipal corporation created pursuant to Ind. Code § 16-22-8 to provide administration for the Division of Public Health and the Division of Public Hospitals. Relevant to the instant investigation, HEALTH & HOSPITAL is responsible for, among other things, operating approximately 75 nursing homes and senior care facilities throughout Indiana.

a.    Since at least 2003, HEALTH & HOSPITAL has contracted with ASC for ASC to provide management services for HEALTH & HOSPITAL's facilities. Pursuant to HEALTH & HOSPITAL's management agreement with ASC, ASC is responsible for, among other things, "establish[ing] prices, rates and charges for services provided at each facility" and for "negotiate[ing] all third party payor contracts." ASC is also required, among other things, to "maintain books and records relating to the operation of the facilities," obtain and keep in force "any and all certifications necessary for maintaining reimbursement from Medicare, Medicaid and all other third party payors," and to "plan, execute and supervise repairs and maintenance at each facility."

b.    HEALTH & HOSPITAL made funds available for ASC to operate the facilities on HEALTH & HOSPITAL's behalf, including funds to pay staff, purchase supplies, and maintain and improve the facilities themselves. These funds were kept in a

bank account owned by HEALTH & HOSPITAL (the "Operating Account"), to which

ASC has access to pay expenses associated with operating the facilities. Specifically,

BURKHART and the ASC Chief Financial Officer had check-signing authority on the

Operating Account. Accordingly, ASC paid vendors directly using funds from HEALTH

& HOSPITAL's account without HEALTH & HOSPITAL's authorization for each

transaction.

   c.  Neither the officers of HEALTH & HOSPITAL nor the Board of

Managers of ASC had any knowledge of the schemes described herein.

  17. **Indiana Medicaid Reimbursements for Nursing Facilities.** Indiana Medicaid

provides medical assistance funding for patients in senior and long-term care facilities, such as

those operated by HEALTH & HOSPITAL and managed by ASC. *See* 405 Ind. Admin. Code

§ 1-14.6-1 et. seq. The rates of reimbursement to such facilities are determined based on a

variety of factors, including costs incurred by the facility in its operation. Reimbursable costs

include certain "allowable administrative services and supplies," *id.* at 1-14.6-2(a), and an

"indirect care component," which includes "patient laundry services and supplies," "plant

operations services and supplies," and "repairs and maintenance," *id.* at 1-14.6-2(w)(3), (5), (10);

*see also id.* at 1-14.6-9(a) ("The Medicaid reimbursement system is based on recognition of the

provider's allowable costs for the direct care, therapy, indirect care, administrative, and capital

components, plus a potential profit add-on payment as defined below.").

  18. **Financial Reporting Requirements.** To allow for an accurate computation of

the reimbursement rate, owners or operators of senior and long-term care facilities are required

annually to submit to FSSA and OMPP financial reports, which must detail the income received

and expenses incurred at the facilities, including administrative expenses. *Id.* at 1-14.6-3(g); 1-14.6-4.

**PROBABLE CAUSE**

19.     This Affidavit concerns two separate schemes to defraud ASC, HEALTH & HOSPITAL, and Indiana Medicaid perpetrated by JOSH BURKHART and JIM BURKHART. One scheme involved CIRCLE CONSULTING, and the other involved HEARTLAND FLAG. The objective of both schemes was to enrich JOSH BURKHART.

### *Scheme Involving CIRCLE CONSULTING*

20.     **MAINSCAPE's Relationship with ASC.** MAINSCAPE has provided landscaping and outdoor maintenance services for ASC facilities for the past 10 years. In general, MAINSCAPE maintained a contract with ASC for the services that MAINSCAPE provided and the fees ASC paid for those services. The contract covered all of ASC's facilities and was renewed on an annual basis. MAINSCAPE personnel, usually MAZANOWSKI, discussed and agreed upon the annual contract fee amount with JIM BURKHART, often over email. Using the annual contract amount, MAINSCAPE billed ASC on a monthly basis (for one-twelfth the annual amount) and sent invoices to ASC's corporate office in Indianapolis. The invoices were sent to the attention of Roger Werner, the ASC Chief Financial Officer. In general, ASC timely paid those invoices via check or electronic funds transfer, which were deposited into MAINSCAPE's bank account at Regions Bank.

21.     **MAZANOWSKI's Cooperation.** Beginning in July 2015, MAZANOWSKI began cooperating with federal agents. He, and a certain number of his employees at MAINSCAPE, have been interviewed by federal agents. Moreover, he has participated in multiple recorded conversations, either over the phone or in person, with JIM BURKHART.

8

Additionally, he has provided contracts and financial information from MAINSCAPE showing the relationship with ASC, JIM BURKHART, and the related LLCs. All of this information provides, in large part, the basis for the paragraphs that follow.

22. **MAZANOWSKI's Description of the Scheme.** MAZANOWSKI stated that approximately six or seven years ago, JIM BURKHART instructed MAZANOWSKI to start paying a "kickback" to an entity described as a "purchasing group" named CIRCLE CONSULTING. JIM BURKHART directed MAZANOWSKI to inflate MAINSCAPE's invoices to ASC by 5 percent and then pay the 5 percent overage to CIRCLE CONSULTING. MAZANOWSKI said he complied with the instruction, and for the past six to seven years, MAINSCAPE has indeed made regular payments to CIRCLE CONSULTING for the 5 percent-inflated portion of the invoiced amount.

23. **Payments to Circle Consulting.** MAZANOWSKI provided federal agents the amounts that, based on MAINSCAPE's books and records, he believes shows the 5 percent overage that MAINSCAPE paid to CIRCLE CONSULTING over the past several years, which is as follows:

| | |
|---|---|
| 2009 | $56,998.20 |
| 2010 | $57,717.46 |
| 2011 | $75,260.41 |
| 2012 | $67,694.94 |
| 2013 | $59,796.77 |
| 2014 | $88,152.86 |
| **Total** | **$405,620.64** |

24. **Interview with MAINSCAPE Controller.** On July 28, 2015, federal agents interviewed Jillian Dougherty, who has been MAINSCAPE's Controller for nine years.

Dougherty confirmed the facts stated in above paragraphs 22 and 23, including that
MAINSCAPE began issued checks to CIRCLE CONSULTING starting in 2009 and that
MAINSCAPE increased the amount of its contract with ASC by five percent to provide the
additional funds to CIRCLE CONSULTING. Dougherty confirmed that this arrangement
continued through the end of 2014.

25.     **BURKHART's Brother Owned CIRCLE CONSULTING.** Sometime after
MAINSCAPE started paying the inflated portion of the invoiced amount to CIRCLE
CONSULTING, JIM BURKHART told MAZANOWSKI that his brother, JOSH BURKHART,
was the primary owner/member of CIRCLE CONSULTING. MAZANOWSKI has met JOSH
BURKHART socially and believes he works as an accountant, but has never conducted business
with JOSH BURKHART on any level. Aside from directing MAINSCAPE check payments to
CIRCLE CONSULTING, neither MAZANOWSKI nor MAINSCAPE have had any other
interactions with CIRCLE CONSULTING. During the interviews, MAZANOWSKI initially
referred to MAINSCAPE's payments to CIRCLE CONSULTING as "finder's fees" or
"commissions," but he subsequently confirmed to the federal agents that the "commissions"
were never earned or legitimate. Rather, JIM BURKHART told MAZANOWSKI that the 5
percent "kickbacks" to CIRCLE CONSULTING were merely to assist his brother.
MAZANOWSKI stated that he did not believe CIRCLE CONSULTING provided any services
to ASC or to MAINSCAPE.

26.     **Recorded Conversation on August 4, 2015.** In a recorded conversation between
MAZANOWSKI and JIM BURKHART on August 4, 2015, MAZANOWSKI asked
BURKHART whether his brother "freaked out" when he stopped receiving the kickbacks from

MAINSCAPE. JIM BURKHART responded, "I've given my brother a lot of money over the last ten years. It's ok. My entire family, I take care of them."

27.    **Financial Analysis of CIRCLE CONSULTING.**

a.    ***Payments from MAINSCAPE.*** A review of bank account records from Regions Bank account number 0096567198, owned by CIRCLE CONSULTING, revealed that fifty-four checks from MAINSCAPE totaling approximately $405,620 – the same figure as the amount provided by MAZANOWSKI and MAINSCAPE – were deposited into the account between February 2, 2009 and December 22, 2014. This amount agrees with the total provided by MAZANOWSKI and MAINSCAPE in paragraph 23.

b.    ***Use of Funds.*** A review of CIRCLE CONSULTING's bank account statements revealed that the majority of the funds deposited into the account were later transferred to and owned by JOSH BURKHART. Additionally, the review revealed that at least $18,000 of the funds in CIRCLE CONSULTING's bank account were transferred to an account owned by MMAJ LLC, an entity wholly owned by JIM BURKHART.

28.    **Impact on Medicaid Reimbursement.** On August 18, 2015, HHS-OIG SA Brent Steele met with Amanda Buls who is a Senior Manager at Myers and Stauffer, an accounting firm engaged by FSSA to process and audit financial reports submitted by providers to Indiana Medicaid. Buls stated that ASC and HEALTH & HOSPITAL submit financial reports annually for each of HEALTH & HOSPITAL's facilities. Buls confirmed that the expenses listed on these financial reports assist FSSA in determining the reimbursement rates applicable for each facility.

a. ***Audit of ASC/HEALTH & HOSPITAL in 2012.*** Buls stated that FSSA, through Myers and Stauffer, performed an audit of ASC/HEALTH & HOSPITAL's cost report submissions for calendar year 2012. During the audit, FSSA requested and received supporting documents and accounting information from ASC and HEALTH & HOSPITAL that support the financial reports for that year.

b. ***Inflated Costs for Landscaping Were Submitted to FSSA.*** SA Steele, with Buls, reviewed the financial reports and supporting documentation submitted by ASC and HEALTH & HOSPITAL for year 2012. SA Steele and Buls found that the 5%-inflated amount charged to ASC by MAINSCAPE flowed through to the financial report for 2012. Buls verified that, per Indiana Medicaid regulations, these inflated costs could increase the reimbursement rate that Medicaid paid for ASC/HEALTH & HOSPITAL-operated facilities.

c. ***HEALTH & HOSPITAL Paid Inflated Costs to ASC.*** A review of the management agreement between HEALTH & HOSPITAL and ASC reveals that HEALTH & HOSPITAL likely paid ASC for the cost associated with the 5%-inflated landscaping invoices. Thus, money to cover the inflated charges flowed from Indiana Medicaid to HEALTH & HOSPITAL, which in turn paid ASC, which in turn paid MAINSCAPE, which finally in turn paid CIRCLE CONSULTING.

29. **Use of "jburk11@hotmail.com" Account.** Documents provided to the FBI show copies of emails concerning CIRCLE CONSULTING between **jburk11@hotmail.com** and an email address known to have been used by JIM BURKHART at ASC. For example, an email sent on March 12, 2015 with the subject line, "FW: Circle Consulting January 2015 Invoice" and an attachment titled "Circle Consulting January 2015 Invoice.pdf." The body of

the email states, in relevant part, "Jim – Per our discussion, I've forwarded on the Circle Consulting invoice for January."

### *Scheme Involving HEARTLAND FLAG*

30.    **HEARTLAND FLAG Provided Flags for ASC.**  Documents obtained by the FBI show that from mid-2009 until mid-2015, JOSH BURKHART, through HEARTLAND FLAG, purchased outdoor flags – namely American flags, Indiana state flags, and ASC-logo flags – for nursing home facilities managed by ASC.  JOSH BURKHART ordered the flags from suppliers, particularly CVS Flags (also known as Collins Flags) of Marion, Indiana, and shipped them to ASC-managed facilities.

31.    **Replacing Flags 3 or 4 Times Per Year.**  According to multiple ASC employees, JIM BURKHART mandated that all of the flags at all of the ASC-managed facilities be replaced 3 or 4 times per year.

32.    **HEARTLAND FLAG Overbilled ASC.**  A financial analysis of HEARTLAND FLAG's costs of operations (e.g., purchasing flags, shipping, and labeling) and the amounts HEARTLAND FLAG charged ASC showed that HEARTLAND FLAG marked up its costs **over 200%**.

    a.    During the 2009-2015 period, Heartland Flag LLC billed and was paid by ASC approximately $587,000 for new flags.

    b.    The expenses associated with operating HEARTLAND FLAG during that same time period were only approximately $210,000.

    c.    This resulted in profit to HEARTLAND FLAG and ultimately, according to bank records, to Josh Burkhart personally of approximately $377,000.

33.     **JIM BURKHART Personally Approved Invoices.** Records show and ASC employees have confirmed that HEARTLAND FLAG's invoices were sent to and personally approved by JIM BURKHART.

34.     **"Justin Barnes" and Email Accounts.** All emails between HEARTLAND FLAG and ASC, other than emails between JOSH BURKHART and JIM BURKHART, were sent from email address **justin.barnes@heartlandflag.com** and the sender/recipient was referred to as "Justin." However, several facts indicate that "Justin Barnes" may have been an alias for JOSH BURKHART used to conceal JOSH BURKHART's identity – and thus relation to JIM BURKHART – from day-to-day ASC personnel with whom JOSH BURKHART interacted.

      a.     First, ASC personnel told investigators that they dealt only with a "Justin Barnes" when ordering flags from HEARTLAND FLAG. No ASC employees were aware that JOSH BURKHART was related to HEARTLAND FLAG in any way.

      b.     Second, none of the ASC personnel has ever met Justin Barnes in person. Their communication with Justin Barnes was almost exclusively by email.

      c.     Third, records obtained by the FBI relating to HEARTLAND FLAG show no emails between **justin.barnes@heartlandflag.com** and CVS Flags/Collins Flags, the company that provided the actual flags. Rather, these records show that emails between HEARTLAND FLAG and the flag suppliers involved only JOSH BURKHART and were sent from JOSH BURKHART's email address at **jburk11@hotmail.com**. No emails between HEARTLAND FLAG and CVS Flags/Collins Flags were signed "Justin" or reference Justin Barnes in any way.

14

     d.     Similarly, records relating to HEARTLAND FLAG do not show any emails between **justin.barnes@heartlandflag.com** and JOSH BURKHART.

     e.     Next, JOSH BURKHART's home address was the only address used for purchasing the flags from CVS Flags/Collins Flags and shipping them via UPS to ASC facilities. There is no indication that HEARTLAND FLAG had an office outside of JOSH BURKHART's home.

     f.     Finally, records from Google identified another email account that was associated with the "@heartlandflag.com" domain: **joshua.burkhart@heartlandflag.com**. An analysis of records from Google show that on multiple occasions a user or users logged into **joshua.burkhart@heartlandflag.com** and **justin.barnes@heartlandflag.com** from the same IP address within one or two minutes of each other, which could suggest that one person logged into both accounts from the same computer at around the same time.

35.    **Other Relevant Email Accounts.**

     a.     ***joshua.burkhart@heartlandflag.com*** *and* ***administrator@heartlandflag.com***

          i.     Records obtained from Google show that the email domain "@heartlandflag.com" was created on April 27, 2011. The contact information for the domain was "Joshua A Burkhart" with JOSH BURKHART's home address. Records confirmed that the **justin.barnes@heartlandflag.com** account was affiliated with this domain.

ii.     Records from Google identified yet another email account that were associated with the "@heartlandflag.com" domain: **administrator@heartlandflag.com**.

iii.    Records from Google show that the last login date for both **justin.barnes@heartlandflag.com** and **joshua.burkhart@heartlandflag.com** was on December 15, 2015. The last login date for **administrator@heartlandflag.com** was on March 28, 2016.

b.    *jburkhart73@gmail.com*

i.    Records obtained from Google show that one of the "contact emails" for the "@heartlandflag.com" domain was **jburkhart73@gmail.com**.

ii.    Records obtained from Google show that the account **jburkhart73@gmail.com** has been logged into numerous times in the last six months, often multiple times per day, suggesting that the account is still in use.

iii.    Records obtained by the FBI relating to HEARTLAND FLAG show that on August 4, 2014, **jburkhart73@gmail.com** received what appears to be an automated email from the Indiana Secretary of State containing a receipt for a business registration for HEARTLAND FLAG by JOSH BURKHART.

iv.    Records obtained by the FBI relating to HEARTLAND FLAG show that private shipping carrier UPS was instructed to send "pickup notifications" to both **justin.barnes@heartlandflag.com** and **jburkhart73@gmail.com**. The send-to location is JOSH BURKHART's home address in Fishers, Indiana.

## BACKGROUND CONCERNING EMAIL

36.     In my training and experience, I have learned that Google and Hotmail provide a variety of on-line services, including electronic mail ("email") access, to the public. Google and Hotmail allow subscribers to obtain email accounts at the domain names gmail.com or hotmail.com, or user-specified domains, like heartlandflag.com, like the email accounts listed in Attachments A-1 and A-2. Subscribers obtain an account by registering with Google or Hotmail. During the registration process, Google and Hotmail ask subscribers to provide basic personal information. Therefore, the computers of Google and Hotmail are likely to contain stored electronic communications (including retrieved and un-retrieved email for Google and Hotmail subscribers) and information concerning subscribers and their use of Google and Hotmail services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.     A Google or Hotmail subscriber can also store with the provider files in addition to emails, such as calendars, address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google or Hotmail. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files. Additionally, evidence regarding a person's whereabouts, which may be relevant to the investigation, may be stored in an online calendar.

38.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such

information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

39. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

40. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a

result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

41. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the

owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

42.     Accordingly, your Affiant submits that there is probable cause to support warrants to search email accounts **justin.barnes@heartlandflag.com**, **joshua.burkhart@heartlandflag.com, administrator@heartlandflag.com**, **jburkhart73@gmail.com**, and **jburk11@hotmail.com** for the period from **January 1, 2009 to the date of this warrant**, as further described herein and in Attachment A, for evidence of the crimes described herein, and as further described in Attachment B, and seize such evidence.

## REQUEST TO SEAL

43.     Because the investigation is ongoing, I respectfully request the Court to seal the Seizure Warrants, and Applications for such Warrants (with accompanying Affidavit), pending further Order of the Court.

I swear under penalty of perjury that the foregoing is true.

Joseph P. Weston, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ___2___ nd day of May, 2016.

HON. MARK J. DINSMORE
United States Magistrate Judge
Southern District of Indiana

## ATTACHMENT A-1

### Property to Be Searched

This warrant applies to information associated with the following four email accounts, which are stored at premises controlled by Google Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (the "Provider"):

**justin.barnes@heartlandflag.com**

**joshua.burkhart@heartlandflag.com**

**administrator@heartlandflag.com**

**jburkhart73@gmail.com**

## ATTACHMENT A-2

### Property to Be Searched

This warrant applies to information associated with the following email account, which is stored at premises controlled by Microsoft Corporation, an email provider headquartered at One Microsoft Way, Redmond, WA 98052 (the "Provider"):

**jburk11@hotmail.com**

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All records or other information stored at any time by an individual using the account, including calendars, address books, contact or buddy lists, pictures, and files;

e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of the federal criminal code (Title 18), including sections 1343 (wire fraud), 1347 (health care fraud), 1349 (conspiracy to commit wire fraud or healthcare fraud), 1956(h) (money laundering conspiracy), 1957 (money laundering), and 371 (conspiracy), those violations involving **Joshua Burkhart** or **James Burkhart** and occurring around and after **January 1, 2009 through the date of this warrant**, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.    Any and all documents, communications, and transactions with or relating to American Senior Communities LLC and any individuals or entities who may do business with American Senior Communities LLC (and any derivations of the names of such individuals and entities), including but not limited to the following:

> James Burkhart
> David Mazanowski
> Mainscape LLC
> Circle City Consulting LLC
> Circle Consulting LLC
> Heartland Flag LLC
> The Health and Hospital Corporation of Marion County
> Bradley Associates P.C.
> "Justin Barnes"

b.    Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

c.    Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

d.     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e.     The identity of the person(s) who communicated with the user ID about matters relating to business or transactions at or with American Senior Communities LLC, any of its facilities, or any entities or individuals doing business with American Senior Communities LLC, including records that help reveal their whereabouts.